IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| Michael Allan Webb, | ) | |
|      Petitioner, | ) | |
| | ) | |
| v. | ) | 1:21cv1042 (LMB/IDD) |
| | ) | |
| B.L. Kanode, | ) | |
|      Respondent. | ) | |

## MEMORANDUM OPINION

Michael Allan Webb ("Petitioner" or "Webb"), a Virginia inmate proceeding pro se, has

filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the

constitutionality of his first-degree murder conviction in the Circuit Court for James City County

and the City of Williamsburg, Virginia. His petition is fifteen pages long, supplemented by a

rambling and repetitive fifty-one-page attachment and seven exhibits. The respondent filed a

Rule 5 Answer and a Motion to Dismiss with supporting briefs and exhibits. [Dkt. Nos. 16-18].

Webb was advised of the opportunity to file responsive materials pursuant to Roseboro v.

Garrison, 528 F.2d 309 (4th Cir. 1975), in accordance with Local Rule 7(K), and he has

responded by filing three motions for summary judgment. [Dkt. No. 23, 24, 25]. Accordingly,

this matter is ripe for disposition. For the reasons that follow, respondent's Motion to Dismiss

will be granted, and the petition dismissed with prejudice.

### I. Summary of Facts[1]

On May 17, 2017, Mary Walker, who had been Edna Webb's supervisor at Eastern State

---

[1] The record consists of the circuit court's manuscript record, transcripts of several motions
hearings, and the sentencing hearing. The manuscript record is not numbered, but it is in
chronological order. The documents in the manuscript referenced herein are designated by title
or date. No transcript of the trial at which Webb was convicted was filed with the circuit court
during either the state criminal or habeas proceedings. The summary of facts is based upon trial
exhibits and the sworn testimony of witnesses during several motions hearings.

Hospital for over two years, called Edna's residence at 9:18 a.m. because Edna was over 45

minutes late for work. Walker had worked with Edna for about 25 years and knew Edna was

"very reliable," and always called if she was going to be absent or late. (2/21/18 Tr. at 12

("TR1"). Walker was aware that Edna's son, Webb, had mental health issues for which he was

not taking medication, and that Edna had described Webb as "being troubled." (TR1 16, 18).

Webb answered the phone and told Walker that Edna was asleep and that he would not "wake

her up."[2] Walker heard Webb state that "he was having trouble with his mother and she was

trying to put him out of the house." (TR1 19). Walker asked Webb to tell Edna to call work when

she awoke, ended the call, and then tried calling Edna's cell phone but did not get an answer. (Id.

17).

        Another co-worker, Nannette Britt, called Edna's residence at 9:25 a.m. Britt also spoke

with Webb, who told her that he "couldn't wake [Edna] up, and that he and his mother had an

argument." Britt asked him to knock on Edna's door, but he refused. (TR1 17). Britt indicated to

Webb that Edna needed to call Britt and that Webb needed to get her. Webb stated he could not

wake her up and refused Britt's request to knock on her door. Upon ending the call, Britt called

the police to ask them to perform a welfare check on Edna. (TR1 20-21).

        At 9:44 a.m., the James City County Police Department ("JCCPD") dispatcher received a

call requesting a welfare check on Edna because she had not shown up for work at the Eastern

State Hospital. (Id.). In response to that dispatch, Officer Brandon Frantz arrived at Edna's

townhouse at 9:52 a.m. (Id.). He knocked repeatedly but there was no answer. Frantz knew that

Edna's supervisor had requested a welfare check after several unsuccessful attempts to contact

---

[2] These facts are taken from the affidavit supporting the Criminal Complaint which Webb
introduced as an exhibit at his August 16, 2018 trial.

her by phone and he had been informed before he arrived at the residence that Webb was

mentally unstable, had not been on medication, and had told Edna's supervisors that Edna was

upstairs sleeping and that he was not going to wake her up "because they'd had a fight." (TR1

32). Frantz verified that Edna's cars were in front of the townhouse.[3] (Id.). Frantz had been

knocking on the front door for about four minutes  when Investigator Slodysko arrived. Slodysko

went around to the rear of the house while Frantz continued to knock on the front door.  At one

point, Frantz believed he heard footsteps coming from within the house above the door. (TR1 31-

34). Frantz continued to knock until Slodysko notified him that the rear sliding glass door was

unlocked and he was able to push it open.

During a hearing on March 5, 2018, Slodysko testified that while standing outside and

looking through the sliding glass door, he could see cleaning products on the dining room floor

near the dining room table, soapy water all over the dining room table, and several bundles in the

kitchen. (3/5/18 Tr. at 87) ("TR2"). He did not observe any forced entry. (TR2 88). Slodysko

called out through the open door but received no response. Frantz joined him at the back door

and both officers entered the kitchen. (TR1 35-36). As Slodysko began to check a pile of

blankets on the kitchen floor he discovered a female body wrapped tightly inside the blankets.

The head of the victim was bloody, and a plastic bag was over her head. Frantz contacted

dispatch for more units.  He and Slodysko remained in the house on the first floor until other

units arrived because they were concerned someone might be in the house. Additional officers

arrived and confirmed that there was no one else present.

Investigator Jake Rice arrived at 10:30 a.m. to be responsible for collecting evidence, but

---

[3] A woman walked up to Frantz and asked if he was looking for Edna and confirmed to Frantz
that both cars in front of Edna's house belonged to her and that she should be there unless she
had gone off with someone. (TR1 35).

he did not collect any evidence until after a search warrant was issued at 1:46 p.m. Rice collected

the first piece of evidence at 2:37 p.m. (TR2 19-20). Although Dr. DiMattia, a medical examiner,

entered the home at about 12:40 p.m. to examine the scene (id.), Rice testified that "[n]othing

was taken from the wrapping" around "the body" and nothing "was touched or collected until

after the search warrant" was issued. (TR2 20-21). Once the "wrappings" were open, the medical

examiner examined the victim, who was suspected to be Edna. (TR2 21). It was later determined

that Edna had been dead for 12 hours. (TR1 35).

Lieutenant Stephen Humphries, JCCPD, had identified Webb as a person of interest and

Webb's description and DMV photo were provided to other police units. (TR2 37-39). Webb

was seen approximately a mile and a half away from Edna's residence at a convenience store at

approximately noon on May 17, 2017. Humphries and Sergeant LeClair responded to the

convenience store, where Humphries approached Webb and a female who was with him. (TR2

40). Webb was cooperative and identified himself. When Humphries asked him what he was

doing, Webb responded that he had not stolen anything from the store even though Humphries

had not alleged that Webb had stolen anything. He asked Webb if he would "mind coming to the

police station." (TR2 42). Webb agreed to go to the station. Although not formally placed under

arrest, Webb was handcuffed for transport. (TR2 42-44). At that time, Humphries was aware that

there was a "history" between Webb and his mother, including an upcoming court case in which

Edna was trying to evict Webb from the house. (TR2 64, 65, 69).[4] He had also been advised that

a female body had been found in the house and that Webb had made statements about Edna

---

[4] At trial, the prosecution introduced certified copies of an unlawful detainer action Edna had
filed against Webb on April 21, 2017. Her affidavit stated that Webb had willfully destroyed
property, "threat[ened] to kill [Edna] and himself," and that Webb broke "house rules." Comm.
Ex. No. 3. The general district court granted the detainer on May 15, 2017 and ordered Webb to
vacate Edna's house within "30 days." (Id.).

provoking him and had threatened to kill Edna "and bury her body." (Def. Ex. No. 1 at 2).

Investigators Slodysko and Pennycuff interviewed Webb at the police station. After Pennycuff advised Webb of his <u>Miranda</u> rights during the interview, Webb agreed to speak with them and answered questions. (TR2 86).[5] Although Webb admitted to speaking with the supervisors from Eastern State at 9:18 and 9:25 a.m. on May 17, 2017, he denied killing Edna.

## II. Procedural History

On May 17, 2017, Webb was arrested for Edna's murder and attorney J. Terry Osborne ("Osborne") was appointed to represent him on May 18, 2017. Osborne filed a motion for Webb to be examined to determine his competency to stand trial and his sanity at the time of the offense. On July 21, 2017, the Juvenile and Domestic Relations Court for the City of Williamsburg and James City County ("juvenile court") found Webb incompetent to assist his counsel and ordered that he be restored to competency.

Webb was sent to Central State Hospital where he was treated and examined by Maria Sverdlova, a Licensed Clinical Psychologist.[6] On November 21, 2017, Sverdlova issued her report, which concluded that Webb suffered from Unspecified Personality Disorder. [Dkt. No. 18-2 at 9]. Although she found that Webb "did not appear with any acute symptoms or major

---

[5] Webb introduced his over 80-page interview with the police as an exhibit at trial. In his interview, after he was advised of his <u>Miranda</u> rights, Webb admitted to talking with two different women that morning from Eastern State Hospital and that he had told them his mother was upstairs sleeping. (Def. Ex. No. 9 at 8, 10, 18, 27). Webb denied fighting with his mother that morning or that there had been an accident. (<u>Id.</u> at 37-38). He admitted that he was on the phone in the kitchen and that, after the second call ended, he smoked a cigarette and then left to go to his girlfriend's house. (<u>Id.</u> 39, 52). Webb also admitted that the calls took place at 9:18 a.m. and 9:25 a.m. (<u>Id.</u> 56, 63-64).

[6] The various psychological reports are not part of the record forwarded to the Court for review. Pertinent portions of the reports, however, are cited and quoted in other portions of the state criminal and habeas proceedings. The circuit court quoted extensively from Sverdlova's November 17, 2017 report during the sentencing proceeding on February 20, 2019. (2/19/20 Tr. at 4-6) ("TR4").

mental disorder," Webb was held "for observation for three months so he could receive 24/7

observation necessary for further diagnostic clarification and for establishing appropriate

treatment." (TR4 4-5). In her report Sverdlova found that

> During this three-month period, Mr. Webb has not displayed any symptoms of a
> psychotic disorder, *i.e.*, delusions, hallucinations, disorganized speech or
> behavior.... [and] he's been observed by various medical professionals and none
> ... noted the presence of any symptoms.
>
> [The staff] noted that [Webb] was articulate, ... displayed a good vocabulary...
> appeared to be above average intelligence, which would, certainly, be sufficient in
> regard to be able to learn court-related material.... [Webb is] a very opinionated
> individual with certain personality traits that ... do, arguably, make him
> challenging to work with as he does appear to view himself as more intelligent
> and knowledgeable than most.
>
> [As to the] question of authority, he tends to be oppositional and defiant when
> rules are imposed on him by others. However, it is the undersigned's current
> thinking that these are features of his personality as opposed to manifestations of
> any serious mental illness, therefore, there's no current barrier to his competency
> to stand trial....[and] he's competent to stand trial.

(TR4 5).

On December 11, 2017, the court determined that Webb was competent and at the

December 19, 2017 preliminary hearing, the court found probable cause to believe Webb had

murdered Edna. The matter was certified to the grand jury, which on January 17, 2018 returned

an indictment charging Webb with first-degree murder.

At his arraignment on January 24, 2018, Webb, who was represented by Osborne, entered

a plea of not guilty. He also filed several pro se written motions during his arraignment, which

included a motion to suppress evidence seized in violation of his Fourth Amendment rights,

specifically addressing the entry and search of the home, and his arrest; a motion to suppress

statements he made while in custody in violation of his Fifth Amendment rights because he was

not advised of his Miranda[7] rights; and a motion for discovery. Webb also moved the court to

---

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

allow his counsel to withdraw and "to represent himself."[8] The court denied his motion to proceed pro se and entered an order memorializing the denial of the motion on January 26, 2018.

Osborne filed a motion for discovery on February 2, 2018, and on February 12, 2018, she filed a motion to suppress the warrantless May 17, 2017 search of the townhouse and a motion to withdraw explaining that she and Webb disagreed over how to proceed, that Webb wanted to represent himself, and that Webb was either unwilling or unable to assist her in preparing a defense.

At a February 21, 2018 hearing, Webb renewed his motion to represent himself. The court orally granted Osborne's motion to withdraw and allowed Webb to represent himself. (Id. 6-8).[9]   The court heard Webb's motion to suppress the entry into, and subsequent search of, the townhouse, but denied the motion, finding, after hearing testimony, that although the officers had entered the home without a warrant their entry was "wholly reasonable under the circumstances

---

[8] The January 24, 2018 hearing in the circuit court was not transcribed.

[9] The court memorialized its decision to allow Webb to waive his right to representation in an Order dated March 8, 2018 as follows:

> The defendant appeared in this Court without being represented by counsel. The Court finds that the defendant was advised of the offense, the nature of the offense, and its potential punishment which includes imprisonment or confinement in jail; possible defenses and circumstances in mitigation thereof; the right to be represented by a lawyer; the right to hire his own lawyer at his own expense and his right to a reasonable continuance to hire a lawyer, or if found to be unable to afford a lawyer, … to have a lawyer appointed by the judge to represent him, but that the defendant would have to pay the statutory fee of the court appointed lawyer if convicted; that representation by lawyer may be in the defendant's best interest and the dangers and disadvantages of self-representation. The Court further finds from the particular background, experience and conduct of the defendant, that the defendant understood the advice and waived his rights to be represented by a lawyer knowingly and voluntarily of his own free will without any threats, promises, force of undue influence. Therefore, this waiver of the right to be represented by a lawyer is accepted for the following case: …Case No. 27354-00, 1st degree murder.

to go inside the house and ... [it was the officers] actual obligation to check on the welfare of James City County residents." (TR1 70).

At the end of the hearing, the court reaffirmed granting Osborne's motion to withdraw, ensured Webb had executed a waiver of counsel form, and then appointed Christopher T. Voltin ("Voltin") as stand-by counsel. (TR1 100-01, 102). The judge also advised Webb against self-representation because he did not believe Webb was looking at his case "objectively" and that an attorney would be able to help him in that regard. (Id. 102).

At the next motions hearing on March 5, 2018, the court heard and denied Webb's motions for bail (TR2 125-26); to suppress evidence gathered from his home after the warrantless entry; and to suppress evidence based upon alleged Fourth, Fifth, Eighth, and Fourteenth Amendment violations (TR2 124, 125, 126-28), but granted Webb's motion to prohibit the prosecution from using any statements he made before being advised of his Miranda rights. (TR2 123).

On April 3, 2018, Voltin assisted Webb with the issuance of a subpoena duces tecum for store video surveillance tape but the store's response, dated May 8, 2018, indicated that the video footage had been erased in the ordinary course of business. On April 4, 2018, the court granted Voltin's request for transcripts of the February 21, 2018, February 22, 2018, and March 5, 2018 hearings.

On May 11, 2018, the court allowed Voltin to withdraw because he claimed to have a conflict of interest with Webb and appointed George U. Brooks, III ("Brooks") as standby counsel.  Brooks' request for a continuance of the May 22, 2018 trial date was granted. August 8, 2018 was set as a motions day and August 16, 2018 was set as Webb's trial date. Citing conflicts with Webb on how to proceed, Brooks sought leave to withdraw and was allowed to withdraw

8

on July 18, 2018. On July 30, 2018, Brandon Waltrip ("Waltrip") was appointed to replace Brooks as stand-by counsel. Webb filed several pro se motions on August 1, 2018.

On August 8, 2018, before addressing Webb's motions, the circuit court renewed the offer to appoint counsel to represent Webb, but he refused, "stating it was safer for [him] to represent [himself]." (8/8/18 Tr. at 6) ("TR3"). The court then addressed and denied all of Webb's motions, which included a motion to dismiss the indictment on the grounds that  no arrangements had been made to record his preliminary hearing, (TR3 13-15); he was not allowed to speak or ask questions during his preliminary hearing, for which Osborne was his attorney, (TR3 19-20, 29); and his Fifth Amendment rights had been violated because there was no proper presentment of an indictment by the grand jury. Webb also complained that he had not personally received a copy of the indictment; however, the court rejected the argument because Webb's counsel at the time had been provided a copy. The court stated it would provide Webb with a copy as well. (TR3 25).

Even though he was proceeding pro se, Webb alleged that former counsel, Osborne, had not properly represented him and informed him of his rights, and complained that his stand-by counsel had done nothing other than have his case continued while he sat in jail. (TR3 29-30). The court reminded Webb that he had been warned about the disadvantages of representing himself, (TR3 34, 35-36), and denied Webb's claims of ineffective assistance of counsel.

The court also denied Webb's motion complaining that he had been denied bond in violation of his Eighth Amendment rights finding that Webb had received a bond hearing on March 5, 2018 (TR3 44); and denied his claim that his speedy trial rights had been violated (TR3 45), observing that stand-by counsel had endorsed the continuances. (TR3 53).

Webb next alleged that the prosecution had mishandled evidence (TR3 55) and raised

9

discovery issues with the court; however, the prosecution produced a four-page list showing all the discovery it had provided to Webb and Osborne, Voltin, and Brooks. Webb's allegations of mishandling evidence consisted of statements in police reports that Webb argued were inconsistent with testimony given at prior hearings. The trial court denied the motion explaining that Webb could handle any inconsistent statements by impeaching the witnesses at trial. (TR3 65, 73).

Webb requested that the court reconsider its ruling denying his motion to suppress the warrantless entry of his home and also moved for the trial judge to recuse himself. The court denied his motions. (TR3 81-82). Webb obtained a witness subpoena for Osborne, his first attorney. At a hearing on August 14, 2018, to address Osborne's motion to quash the subpoena, the court denied Osborne's motion and ordered her to appear at Webb's trial because Osborne had been present at the preliminary hearing and could testify about the testimony provided at that the preliminary hearing.

The case went to trial as scheduled on August 16, 2018. On August 17, 2018, the jury convicted Webb of first-degree murder and recommended a life sentence, which the court imposed on February 20, 2019. At sentencing, Webb's appointed stand-by counsel Waltrip raised several objections to the pre-sentence report and moved for an order directing that Webb be examined to determine if he was competent to be sentenced. Waltrip advised the court that Webb opposed that motion. (2/20/20 Tr. 2-3) ("TR4"). The motion was denied. After Webb was sentenced, the court appointed Waltrip to handle Webb's direct appeal.

As Webb's appellate counsel, Waltrip filed a petition for appeal in the Court of Appeals of Virginia, arguing that the trial court had erred by denying the motion to suppress evidence found in Webb's home when the police entered without a warrant and by allowing Webb to

10

represent himself at trial because he had mental health problems. On August 13, 2019, Webb

filed a pro se motion in the Court of Appeals of Virginia to amend the assignments of error in the

petition for appeal, by adding claims addressing  prosecutorial misconduct, exculpatory

evidence, falsification of police reports, unlawful searches, mishandling of evidence, fraud upon

the court, ineffective assistance of counsel, "judicial error," unlawful arrest, unlawful

imprisonment, denial of bail, indictments not based upon probable cause, double jeopardy,

speedy trial, denial of a jury of his peers, perjury by a witness, denial of his right to cross-

examine, denial of his right to confrontation and discovery, denial of the right of self-

representation, denial of continuances, and denial of a preliminary hearing transcript. On

September 30, 2019, Webb's motion to amend the petition was denied. Defense counsel's

petition for appeal was denied by an order issued on November 27, 2019, and a three-judge panel

adopted the reasoning of the November 27, 2019 order when it denied Webb's petition for appeal

on January 27, 2020. Webb v. Commonwealth, Record No. 0789-19-1.

Webb, by counsel, appealed that decision to the Supreme Court of Virginia raising the

same two issues. The court refused this petition on July 28, 2021;[10]  however, more than a year

before the Virginia Supreme Court resolved his direct appeal, acting pro se, Webb filed a state

habeas petition in the circuit court on February 14, 2020, Webb v. Kanode, Case No.

CL20000423, raising 29 claims, identified as Claims A through CC. Respondent filed a motion

to dismiss the habeas petition on June 16, 2020. Once again acting prematurely because the

circuit court had not resolved his petition, Webb filed a notice of appeal on July 9, 2020 that

stated he was "Filing  Notice of Appeal, And will be Appealing the Rejected Habeas Corpus

---

[10] Webb v. Commonwealth, Record No. 200282, cert. denied, Webb v. Virginia, 142 S. Ct. 607
(2021).

That was Denied [sic] In The JCC Williamsburg VA Court." Thereafter, he filed a petition for appeal that was received and filed in the Supreme Court of Virginia on July 31, 2020. The Clerk of the Supreme Court of Virginia notified Webb by letter dated August 3, 2020 that his petition for appeal had been received, but that it exceeded the page limit and did not indicate it had been served on the respondent's counsel. <u>Webb v. Kanode</u>, Record No. 200968, at 219 ("VSCT"). The letter also requested the date of the final order that Webb was appealing. Webb's replacement petition for appeal, postmarked August 19, 2020, contained a certificate of service stating he had served the respondent and that Webb was appealing a final order dated June 15, 2020, even though no final order had yet been issued by the circuit court. [<u>Id.</u> at 171, 172, 198]. The final order dismissing Webb's state habeas petition was issued on September 4, 2020. [Dkt. No. 18-10].[11]

On May 19, 2021, the Supreme Court of Virginia dismissed Webb's premature petition for appeal of the habeas petition "without prejudice to the right of the petitioner to appeal a final order of the circuit court" because Webb's notice and petition were filed "before the circuit court entered a final order." (VSCT 215) (citing Va. Sup. Ct. Rule 5:9(a)). Rather than complying with that order, on June 21, 2021 Webb filed a motion to strike, and on July 12, 2021 filed a motion for extension of time to file a petition for rehearing. Both motions were denied by an order dated

---

[11] The circuit court dismissed 22 of the 29 claims—B, C, D, E, F (to the extent Claim F raised a claim other than ineffective assistance of counsel), G, H, J, K, L, M, Q, T, U, V, W, X, Y, Z, AA BB, and CC—pursuant to the rule of <u>Slayton v. Parrigan</u>, 205 S.E.2d 680, 682 (Va. 1974) (non-jurisdictional issues not raised at trial and on direct appeal are not cognizable in a petition for a writ of habeas corpus). The court dismissed Claim A pursuant to the rule of <u>Henry v. Warden</u>, 576 S.E.2d 495, 496 (Va. 2003) because it was raised and decided in the trial court and on direct appeal from the criminal conviction and, therefore, could not be raised in a habeas corpus petition; and dismissed Claims F (to the extent it alleged an ineffective assistance of counsel claim), I, N, O, P, R, and S for not stating a claim of ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

August 13, 2021. (Id. 229). The Supreme Court of Virginia rejected Webb's petition for

rehearing because it was not timely filed (Id. 230).

### III. Federal Claims

On August 25, 2021, Webb filed the pending federal petition for writ of habeas corpus,[12]

which raises 29 often overlapping claims, each of which is followed by a lengthy, rambling

description of issues.   The following list includes in quotation marks the title that petitioner

gave each claim, followed by a summary of petitioner's lengthy description of the claim:

1.  "Unlawful Search and Seizure, After Unlawful Entry Violating 4th
    Amendment." [Dkt. No. 1 at 5]. Webb alleges the police unlawfully used a
    911 call to incriminate him in a crime; the police searched him intending
    to arrest him; the police unlawfully entered his home without a warrant
    because the facts did not establish exigent circumstances and they had no
    probable cause; the police unlawfully searched the homicide scene before
    obtaining a warrant; and the police used tainted and falsified evidence to
    obtain the warrants.

2.  "Various Violations To My 6th Amendment." [Id. at 7]. Webb claims he
    was denied his Sixth Amendment rights by being forced to represent
    himself due to inadequate counsel; he was placed in double jeopardy
    because the court never allowed him to exercise his Sixth Amendment
    right to represent himself; and the court appointed ineffective attorneys to
    assist him because he was allegedly mentally ill.

3.  "Unlawful Arrest Prior To Warrant In Violation of My 4th and 5th
    Amendment." [Id. at 8]. Webb repeats his claim that his arrest before a
    warrant was issued violated his Fourth and Fifth Amendment rights, his

---

[12] The Fourth Circuit recently held that a district "court must consider claims as they are
presented in the petition, reviewing them under the applicable standard.... [and it is] the district
court's duty to consider *only* the specific claims raised in a § 2254 petition." Folkes v. Nelsen, 34
F.4th 258, 269 (4th Cir. 2022) (citations omitted) (emphasis added). Webb's federal petition set
forth four claims on the standard form for §2254 petitions and listed additional claims in an
attachment to the form. [Dkt. No. 1-1 at 2-3]. Many of the claims in the attachment duplicate the
ones raised on the form. The form lists Claims 1 through 4, but plaintiff began the numbering of
the claims he included on his attachment with "Claim 1." The Court has renumbered the claims
in the attachment as a continuation of the form. For example, Claim 1 in the attachment is listed
as Claim 5 in this Memorandum Opinion. See infra at 14. For clarity, the numbers Webb used for
each claim in the attachment are listed in parentheses at the end of each claim. Webb
supplemented his claims  with repetitive and rambling arguments and portions of those
arguments are summarized after the claim for context.

warrantless arrest was unlawful because the police used evidence from a warrantless search and seizure to incriminate him, he was in custody before a warrant was issued and was not free to leave; and was interrogated with inadmissible evidence unlawfully seized from his home.

4. "Categorical Violations To My 6th Amendment Speedy Trial Rights, Ineffective Assistance, Right To Represent Myself." [Id. at 10]. Webb argues his speedy trial rights were violated, and his indictment was the result of an unlawful grand jury hearing.

5. "Unlawful Calls Used to Affect My Arrest." [Dkt. No. 1-1 at 4] (Claim 1). Webb repeats that his Fourth and Fifth Amendment rights were violated because he was arrested without a warrant or probable cause.

6. "Unlawful Entry Prior To Exigent C." [Id. at 2, 4] (Claim 2; Claim A). Webb repeats prior Fourth Amendment claims.

7. "Unlawful Entry To Search And Seize My Person In MY Home." [Id. at 2, 5] (Claim 3, Claim B). Webb argues his Fourth Amendment rights were violated because the officers unlawfully entered his home to arrest him and search his person.

8. Unlawful Police Search Of My Homicide Scene Without Warrant." [Id. at 2, 6] (Claim 4, Claim B). Webb argues that the officers' failure to secure the scene when they entered without a warrant violated his Fourth Amendment rights.

9. "Unlawful Search of My Person." [Id. at 2, 5] (Claim 5). Webb claims that the police violated his Fourth and Fourteenth Amendment rights by using their unlawful search of his person and personal effects to draft arrest and search warrants.

10. "Unlawful Search Of My Phone Prior To Warrant." [Id. at 2, 6] (Claim 6). Webb complains that the police violated his Fourth and Fourteenth Amendment rights by searching his cell phone with an invalid warrant; and that he was denied an evidentiary hearing on this issue.

11. "Unlawful Arrest Prior to Warrant." [Id. at 2, 7] (Claim 7). Webb argues that the police violated his due process rights by arresting him unlawfully without a warrant or probable cause.

12. "Was Not Read Miranda Rights In A[n] Arrest." [Id. at 2, 7-9] (Claim 8). Webb argues that the police violated his rights by arresting him without probable cause and without a warrant, and that he was not read his Miranda rights after he was detained and illegally interrogated.

13. "Not Free To Terminate Investigation Or Use Of Unlawfully Gained Statements In False Arrest." [Id. at 2, 9] (Claim 9). Webb argues that the police violated his Fourth and Fifth Amendment rights because his warrantless arrest was an unlawful kidnaping.

14. "Unlawful Transportation Prior To Warrant Or Probable Cause." [Id. at 2,

9] (Claim 10). Webb argues that the police violated his Fourth and Fifth Amendment rights by driving him to the police station before a warrant was issued.

15.   "Unlawfully Subject To [unintelligible] Tactics Search And Arrest Prior To Warrant." [Id. at 2, 10] (Claim 11). Webb argues that the warrantless search of his home was used to manufacture false evidence to support a false finding of probable cause to justify his arrest and the search.

16.   "Unlawful Seizure of Literature, Religious Journals, Effects Due To The Ideals They Reflect." [Id. at 2, 11-12] (Claim 12). Webb argues that the police violated the First Amendment by seizing his letters, notes, books documents "doctrines" and handwritten confession, and that the unlawful seizure of the documents also violated Webb's right against self-incrimination.

17.   "Violation of My Right To Counsel To Provide Me Adequate Representation." [Id. at 2, 12-17] (Claim 13) (Osborne). Webb argues that Attorney Osborne denied Webb his right to effective assistance of counsel because she had him committed; never challenged his unlawful arrest while he was detained awaiting his preliminary hearing; deprived him of the ability to impeach Investigator Pennycuff, who perjured himself at trial because his testimony conflicted with the police reports; did not insure a stenographer was present at the preliminary hearing so Webb did not have a transcript to impeach the officer on cross-examination at trial; could not recall the relevant previous testimony to impeach the officer when Webb called her to testify; failed to object to the Commonwealth's "angry black and crazy" theory; and sided with the prosecution by telling Webb the police had not violated his Fourth and Fifth Amendment rights, constituting a "conflict of interest."

18.   "Ineffective Assistance Of Counsel." [Id. at 2, 17-20] (Voltin) (Claim 14). Webb argues that Voltin's appointment constituted a conflict of interest because Webb wished to represent himself. Further, Voltin was ineffective because: he failed to object to invalid arrest warrants and search warrants; failed to object to the lack of a stenographer at the preliminary hearing; was indifferent and failed to file a pretrial motion to object to constitutional violations, involving search and seizure, unlawful arrest, and unlawful warrant; failed to object to Webb's right to stand on his preliminary records; failed to request an evidentiary hearing regarding false statements at his preliminary hearing; was "aligned with the state," creating a "conflict of interest" and "double jeopardy"; requested continuances in violation of Webb's speedy trial rights; and had a conflict of interest based on his partner's representation of another person.

19.   "Ineffective Assistance Of Counsel When Lawyer Does Not Argue False Continuance Not Made On The Record." [Id. at 2, 20-22] (Brooks) (Claim 15). Webb argues that Brooks was appointed against Webb's will and was ineffective for requesting continuances that violated Webb's constitutional

and statutory speedy trial rights; failed to object to Webb's unlawful arrest, statements, transportation, interrogation, and false imprisonment; interfered in his right to represent himself; failed to object to the lack of preliminary hearing transcript; aligned himself with the Commonwealth; and withdrew after Webb filed a pro se motion asking the court to recuse itself.

20.    "Ineffective Assistance In Post-Conviction Appeal." [Id. at 25] (Waltrip) (Claim 16). Webb argues that his appointed appellate counsel, Waltrip, was ineffective because he failed to raise numerous arguments on appeal regarding numerous constitutional violations (speedy trial, unlawful search, unlawful arrest, no Miranda warning, unlawful transportation, invalid warrants, discovery violation, confrontation violations, and Batson).

21.    "Unlawfully Imprisoned Denied Bond On A Warrantless Arrest." [Id. at 2, 26-31] (Claim 17). Webb argues his Eight Amendment rights to bail were violated because his indictment was faulty, his arrest was unlawful, he should have never been committed to a mental health facility, and his speedy trial rights were violated.

22.    "Unlawfully Denied To Act As My Own Counsel." [Id. at 2, 31-34] (Claim 18). Webb argues the judge denied him his right to act as his own counsel after Webb was allowed to proceed without counsel because his stand-by counsel were granted continuances that Webb never requested denying him control of his defense and violating his right to a speedy trial.

23.    "Violation Of Right To Adequate Due Process In A Lawful Grand Jury Indictment Where Unlawful Members Were Allowed To Be Members Of Its Panel." [Id. at 3, 32-36] (Claim 19). Webb argues he was denied due process because the officer who testified before the grand jury falsified evidence, used unlawfully obtained evidence, and the officer was allowed to be a member of the grand jury.

24.    "I Was Denied A Court Ordered Motion To Have My Preliminary Hearing Transcribed To Establish Probable Cause To Hold My Person." [Id. at 3, 37-39] (Claim 20). Webb argues he was denied a transcript of his preliminary hearing, which deprived Webb of the ability to show conflicts in the testimony of witnesses.

25.    "Prosecutorial Abuse Of Charging Power Used With Malice On My Person When Perjury, Bar[r]atry, Unlawful Evidence And Evidence Used By Him In Court." [Id. at 3, 39-47] (Claim 21). Webb argues the prosecutor was aware that his Fourth Amendment rights were violated and he did nothing about the violations and used the unlawfully obtained evidence to convict Webb; violated his right to a speedy trial; violated his rights by not serving him with the indictment for over eight months; suppressed evidence; used perjured testimony; used false evidence; and did not ensure the stenographer was present at Webb's preliminary hearing.

26.     "Prosecutorial Mishandling Of Evidence." [Id. at 3, 47-48] (Claim 22).
        Webb argues that the prosecutor coerced and manufactured evidence he
        used to establish exigent circumstances to justify the unlawful search
        without a warrant and Webb's unlawful arrest, and unlawfully collect
        evidence used at Webb's trial.

27.     "Prosecutorial Introduction Of Invalid Witness And Denied Their Pre-
        examination Prior To Trial Also The Use Of Test Or Findings Of A Lab
        Without Proper Or Same Technician To So Accompany Them In Trial."
        [Id. at 3, 48-50] (Claim 23). Webb argues the prosecutor denied him the
        names of the scientific expert witness that testified at his trial and another
        witness that testified about a trespassing charge, which denied him the
        ability to prepare for trial and denied him a fair trial.

28.     "I Was Not Afforded A Fair Trial Due To I Not Judged By A Jury Of My
        Own Peers In A None Partial Format[]. Thus I Was Denied A Jury As A
        Black Man A Person Of Color To Be On A Jury Of 12 Which Was
        Unlawful." [Id. at 3, 50] (Claim 24). Webb argues he was denied his right
        to a jury of his peers because the prosecutor struck the only black person
        called for jury duty.

29.     "Unlawfully Subject To Due Process Violation And Post-Conviction
        Relief In Trial And VA Sup Habeas Courts." [Id. at 3, 51] (Claim 25).
        Webb argues in support of his claim that the Supreme Court of Virginia
        violated his Fifth and Fourteenth Amendment rights by dismissing
        (without prejudice) his petition for appeal from the circuit court as
        premature because he filed his notice of appeal and petition for appeal
        before the entry of a final order by the circuit court. [Id. at 51].

### IV. Fourth Amendment Claims are not Cognizable
### in Federal Habeas under Stone v. Powell, 428 U.S. 465 (1976)

As can be seen from the titles of Webb's claims, a majority of his claims are premised, in

whole or in part, upon alleged violations of his Fourth Amendment rights; however, Stone v. Powell

holds that "where the State has provided an opportunity for full and fair litigation of a Fourth

Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground

that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. at 494

(footnote omitted); see, e.g., Boggs v. Bair, 892 F.2d 1193, 1200 (4th Cir. 1989) (petitioner had a

full and fair opportunity to litigate the search of his vehicle and his subsequent statements were not

fruit of the poisonous tree). Stone requires only the availability of procedures for the defendant to

litigate the issue in state court; a defendant's failure to take advantage of the opportunity, whether intentionally or through inadvertence, does not circumvent the rule of <u>Stone</u>. <u>United States ex rel. Maxey v. Morris</u>, 591 F.2d 386, 388-89 (7th Cir. 1979), <u>cert. denied</u>, 442 U.S. 912 (1979).

When faced with Fourth Amendment claims in a habeas proceeding, a district court should "first inquire as to whether or not the petitioner was afforded an opportunity to raise his Fourth Amendment claims under the then existing state practice." <u>Doleman v. Muncy</u>, 579 F.2d 1258, 1265 (4th Cir. 1978). <u>Doleman</u> found that Virginia provides a full and fair opportunity in accordance with <u>Stone</u> because in Virginia a defendant has the "opportunity to present his Fourth Amendment claims by a motion to suppress both at the trial court level and thereafter to assign as an error, an adverse ruling thereon, on appeal." <u>Id.</u> The record establishes that Virginia procedures provided Webb with a means to raise Fourth Amendment claims at trial and on appeal, and that in fact he did so. Webb's first counsel, Osborne, filed a motion to suppress alleging a Fourth Amendment violation and Webb filed several <u>pro se</u> motions to suppress also alleging Fourth Amendment violations. Webb's motions challenged the entry into the house, the search of the house, his arrest without a warrant, and his detention without a warrant. The circuit court held evidentiary hearings on these motions, all of which were denied. Webb properly raised a Fourth Amendment claim on appeal and the Virginia appellate courts denied that portion of his appeal on the merits. For these reasons, to the extent Webb raises Fourth Amendment claims in Claims 1, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15, these claims will be dismissed in accordance with <u>Stone</u>.

### V. Exhaustion and Procedural Default

In addition to being barred by the <u>Stone</u> doctrine, Webb's Fourth Amendment Claims (other than Claim 1, which Webb raised on direct appeal) and all of his other claims must be dismissed on the grounds that they have been simultaneously exhausted and defaulted.  As the

18

record shows, Webb failed to present these claims properly to the Supreme Court of Virginia on direct appeal and also failed to file a proper petition for appeal from the circuit court's denial of his petition for writ of habeas corpus to the Supreme Court of Virginia. See Corcoran, 220 F.3d at 288; see also Whitley v. Bair, 802 F.2d 1487, 1500 (4th Cir. 1986) (failure to appeal adverse decision of state habeas court constitutes a bar to further federal review of a claim).

"A habeas petitioner is generally barred from obtaining federal habeas review of a claim if he failed to exhaust the claim in state court." Morva v. Zook, 821 F.3d 517, 532 (4th Cir. 2016) (citation omitted). A federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court. Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000). "To [exhaust his claims], the petitioner must have presented to the state court 'both the operative facts and the controlling legal principles.'" Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002) (citation omitted). It is Webb's burden to demonstrate he has exhausted his claims. See Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998).

A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court. See Hedrick v. True, 443 F.3d 342, 364 (4th Cir. 2006). Presenting a claim in a procedural context in which the merits of the claim will not be considered, or will be considered only in special circumstances, does not constitute fair presentations of the claim. Castille v. Peoples, 489 U.S. 346, 351 (1989).

A separate but analytically related bar to federal habeas review is the doctrine of procedural default. "If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent

19

and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his

federal habeas claim." Breard, 134 F.3d at 619. "A habeas petitioner is barred from seeking

federal review of a claim that was presented to a state court and 'clearly and expressly' denied on

the independent, adequate state ground of procedural default." Bennett v. Angelone, 92 F.3d

1336, 1343 (4th Cir. 1996) (citations omitted). A state procedural rule is "adequate" if it is firmly

established and regularly or consistently applied by the state court and "independent" if it does

not depend on a federal constitutional ruling. Yeatts v. Angelone, 166 F.3d 255, 263- 64 (1998).

In his state habeas proceeding, Webb filed his notice of appeal and petition for appeal

before the circuit court entered an order dismissing his state habeas claims. [Dkt. Nos. 18-10 and

18-14]. In Virginia, the Supreme Court of Virginia does not acquire jurisdiction until a final

order is entered. See Comcast of Chesterfield Cty., Inc. v. Board of Supervisors, 672 S.E.2d 870,

873 (Va. 2009) ("[A] writ of error does not lie except where there has been a final order or

judgment in the cause," and without a final order, the Court "is without power to exert its

appellate jurisdiction.") (citations omitted).[13] The Supreme Court of Virginia did not consider the

merits of Webb's petition for appeal and dismissed it without prejudice pursuant to Rule 5:9(a)

because it was premature. [Dkt. No. 18-14]. See Leggett v. Caudill, 439 S.E.2d 350, 351 (Va.

1994) (an order is not final and appealable if claims remain unresolved).

Webb never took any steps to perfect review of the dismissal of his state habeas petition

after being advised of this defect by respondent's counsel September 2, 2020 letter to the

Supreme Court of Virginia informing that court that no final order had been entered in the circuit

---

[13] See, e.g., Rutter v. Oakwood Living Ctrs. of Va., Inc., 282 Va. 4, 15, 710 S.E.2d 460, 466
(2011) (court, sua sponte, dismissed a granted appeal without prejudice because the order
appealed from "was not final for purposes of appeal" and, therefore, the court had "no
jurisdiction over this appeal").

court. [Dkt. No. 18-13]. Webb could have cured the timeliness issue simply by filing a notice of appeal after the final order was entered a few days later. Because he never filed a timely notice and petition for an appeal from the dismissal of his state habeas claims, the claims he raised in his state habeas petition are now barred from review because the time to do so has expired. See Va. Sup. Ct. Rules 5:9 and 5:17. A default based on a failure to comply with Va. Sup. Ct. Rule 5:9 is an adequate and independent procedural default that bars federal review. See Coleman v. Thompson, 501 U.S. 722 (1991) (affirming dismissal of habeas corpus petition as procedurally barred by failure to comply with Rule 5:9(a), which establishes Virginia's thirty-day requirement for filing notice of appeal). See, e.g., O'Dell v. Netherland, 95 F.3d 1214, 1244 (4th Cir. 1996) (dismissal of appeal from denial of writ of habeas corpus as untimely pursuant to Rule 5:17(a)(1) was independent and adequate state law ground barring federal habeas review); Wise v. Williams, 982 F.2d 142, 144 (4th Cir. 1994) (Rule 5:9(a) is independent and adequate state bar). Further, Webb is also barred from raising trial error claims other than the ones he properly raised on direct appeal because those claims would be barred in a new state habeas proceeding by the rule in Slayton v. Parrigan, and by the successive petition rule in Va. Code 8.01-654(B)(2).[14]

---

[14] The Fourth Circuit has repeatedly recognized that the procedural default rule set forth in Parrigan constitutes an adequate and independent state law ground for decision. Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998) (citation omitted). Virginia's habeas statute of limitations is an independent and adequate state procedural rule that bars federal review. See Walker v. Martin, 562 U.S. 307, 321 (2011) (state statutes of limitations may be an independent and adequate state law ground barring federal habeas review); Sparrow v. Dir., Dep't of Corr., 439 F. Supp. 2d 584, 587-88 (E.D. Va. 2006) (finding federal habeas claims simultaneously exhausted and defaulted because the claims not presented in state court would now be time barred by adequate and independent default of Virginia Code § 8.01-654(B)(2)).

A. *Cause and Prejudice*

Even if a claim has been defaulted a federal court may review it if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law" or a fundamental miscarriage of justice. See Vinson v. True, 436 F.3d 412, 417 (4th Cir. 2005). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." Coleman, 501 U.S. at 753 (citation omitted). To establish cause, a petitioner must "show that some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). The existence of cause ordinarily turns upon a showing of (1) a denial of effective assistance of counsel, (2) a factor external to the defense which impeded compliance with the state procedural rule, or (3) the novelty of the claim. See Coleman, 501 U.S. at 753-54; Clozza v. Murray, 913 F.2d 1092, 1104 (4th Cir. 1990); Clanton v. Muncy, 845 F.2d 1238, 1241-42 (4th Cir. 1988).

To show "prejudice," a petitioner must show that an alleged constitutional violation worked to his "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis removed). A court need not consider the issue of prejudice in the absence of cause. See Kornahrens v. Evatt, 66 F.3d 1350, 1359 (4th Cir. 1995).

> In some circumstances, ineffective assistance of counsel may be sufficient "cause" for a defaulted claim. See Edwards [v. Carpenter, 529 U.S. 446, 451 (2000)]; Slavek v. Hinkle, 359 F. Supp. 2d 473, 480 (E.D. Va. 2005). Importantly, where a petitioner for federal habeas relief seeks review of claims defaulted during state habeas proceedings, he must show that he raised the ineffectiveness argument as a cause for the defaulted substantive claims during his state habeas proceedings. If a petitioner did not raise the ineffectiveness claim at the state habeas level, a federal habeas court may not consider it. Edwards, 529 U.S. at 452-53.

Powell v. Kelly, 531 F. Supp. 2d 695, 723 (E.D. Va. 2008), aff'd, 562 F.3d 656 (4th Cir. 2009)

22

(emphasis added). Because Webb did not exhaust his allegations of ineffective assistance of counsel in state court, the ineffective assistance of counsel claims cannot be considered as a cause under Edwards to review the substantive claims.

The record also does not indicate that any external cause resulted in Webb's default on appeal of the circuit court's dismissal of his habeas petition. To the contrary, that fault lies solely with Webb. To the extent he might claim "ignorance," Webb's "pro se status and his ignorance of Virginia law do not constitute cause sufficient to excuse his default" Wilson v. Lee, No. 3:02cv551, 2003 U.S. Dist. LEXIS 29320, *4 (E.D. Va. Apr. 4, 2003) (citing Steele v. Young, 11 F.3d 1518, 1522 (10th Cir. 1993); Miller v. Bordenkircher, 764 F.2d 245, 251-52 (4th Cir. 1985)); see also United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004) (pro se petitioner's ignorance and misconceptions about the operation of the statute of limitations do not justify equitable tolling because they are not extraordinary circumstances beyond his control).

*B. Actual Innocence*

The Supreme Court held in McQuiggin v. Perkins, 569 U.S. 383, 392 (2013), that a convincing claim of actual innocence "may allow a prisoner to pursue his constitutional claims ... on the merits notwithstanding the existence of a procedural bar to relief." The exception applies only in a "severely confined category"— that is, in a case in which reliable *new* evidence shows that "it is more likely than not that 'no reasonable juror' would have convicted" the petitioner had the evidence been available at trial. Id. Here, Webb has failed to cite to any new evidence to establish a claim of actual innocence; instead, all he has done is to reiterate various allegations he raised either during pretrial proceedings or during his trial.

C. *Martinez v. Ryan*, 566 U.S. 1 (2012)

In Martinez v. Ryan, the United States Supreme Court recognized an exception to the

default doctrine for a "substantial" ineffective assistance claim in connection with an initial-

review collateral proceeding addressing claims of trial counsel error. See Atkins v. Holloway,

792 F.3d 654, 661 (6th Cir. 2015) (citations omitted); Johnson v. Warden of Broad River Corr.

Inst., No. 12-7270, 2013 U.S. App. LEXIS 4740, *2 (4th Cir. Mar. 8, 2013) ("while ineffective

assistance in initial-review collateral proceedings might constitute cause for failure to exhaust

certain claims, the Martinez rule did not 'concern attorney errors in other kinds of proceedings

including appeals from initial-review collateral proceedings.'") (citing Martinez, 566 U.S. at

16).[15] With the exception of the Fourth Amendment claim raised on direct appeal (Claim 1),

which is not cognizable under Stone, all of Webb's claims are defaulted because he did not

properly perfect his appeal of the circuit court's dismissal of his state habeas petition. Martinez,

therefore, is inapplicable and Webb's claims are barred from federal habeas review. See Davilla

v. Davis, 137 S. Ct. 2058, 2063 (2017) (declining to extend the holding of Martinez to defaulted

claims of ineffective assistance of appellate counsel); Banks v. Workman, 692 F.3d 1133, 1148

(10th Cir. 2012) ("Martinez applies only to 'a prisoner's procedural default of a claim of

ineffective assistance at trial,' not to claims of deficient performance by appellate counsel")

(citation omitted). Moreover, because the ineffective assistance of counsel claims involving

Voltin, Brooks, and Waltrip (before his appointment as counsel for sentencing and appeal),

---

[15] See also Arnold v. Dormire, 675 F.3d 1082, 1087 (8th Cir. 2012) (where ineffective assistance claims were litigated in the initial-review collateral proceeding, but not preserved on appeal, unlike the petitioner in Martinez, [such a habeas petitioner] "has already had his day in court; [and] deprivation of a second day does not constitute cause."); Norris v. Brooks, 794 F.3d 401, 405 (3d Cir. 2015) (citations omitted) (explaining that Martinez "applies only to attorney error causing procedural default during initial-review collateral proceedings, not collateral appeals").

24

involve periods of time when each was appointed to act only as stand-by counsel to assist Webb, he cannot claim ineffective assistance of counsel because he chose to represent himself at trial. See United States v. Windsor, 981 F.2d 943, 947 (7th Cir. 1992) (rejecting the pro se defendant's assertion that stand-by counsel was ineffective, finding that a "defendant who has elected to represent himself 'cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel.'") (quoting Faretta v. California, 422 U.S. 806, 834-35 n.46 (1975)); Lee v. Hines, 125 F. App'x 215, 217 (10th Cir. 2004) ("A defendant who chooses to represent himself and has the assistance of court appointed stand-by counsel cannot succeed in establishing ineffective assistance against such counsel when it is clear that the defendant maintained control of his defense.")

Because all of Webb's claims are either precluded from federal review under the Stone rule, defaulted, or both, and the record does not establish cause to excuse the defaults, all of his claims will be dismissed.

### D. Webb's Motions for Summary Judgment

Webb's only responses to the motion to dismiss were three short but rambling pleadings titled as motions for summary judgment. Summary judgment is appropriate only when the moving party has demonstrated that "no genuine issue of material fact remains for trial." Brandt v. Gooding, 636 F.3d 124, 132 (4th Cir. 2011) (citation omitted). Moreover, the Federal Rules of Civil Procedure are applicable in habeas proceedings only to the extent they do not conflict with the habeas rules. See Rule 12 of the Rules Governing Section 2254 Cases.

> Summary judgment in federal habeas is different than in the average civil case. See, e.g., Smith v. Cockrell, 311 F.3d 661, 668 (5th Cir. 2002), abrogated on other grounds by Tennard v. Dretke, 542 U.S. 274 (2004) ("[Section] 2254(e)(1) – which mandates that findings of fact made by a state court are 'presumed to be correct' – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving

party. Unless [the petitioner] can 'rebut [ ] the presumption of correctness by clear
and convincing evidence' as to the state court's findings of fact, they must be
accepted as correct." (third alteration in original)).

Torres v. Thaler, 395 F. App'x 101, 106 n.17 (5th Cir. 2010). "Therefore, § 2254(e)(1)—which

mandates that findings of fact made by a state court are presumed to be correct—overrides the

ordinary summary judgment rule that all disputed facts must be construed in the light most

favorable to the nonmoving party." Smith, 311 F.3d at 668. In the context of habeas review, a

state court's determination of a factual issue is presumed correct. Teti v. Bender, 507 F.3d 50, 58

(1st Cir. 2007); Proctor v. Cockrell, 283 F.3d 726, 729-30 (5th Cir. 2002).

Webb's motions for summary judgment assert the Supreme Court of Virginia is

responsible for his default in his state habeas proceeding. [Dkt. Nos. 23, 24, 25].[16] The record is

to the contrary. Moreover, to the extent Webb alleges the Supreme Court of Virginia erred by

dismissing his premature appeal, he is raising an error of state law in a post-conviction

proceeding. Claims of procedural error in a state post-conviction proceeding cannot serve as a

basis for federal habeas corpus relief. Bryant v. Maryland, 848 F.2d 492, 493 (4th Cir. 1988);

Lawrence v. Branker, 517 F.3d 700, 717 (4th Cir. 2008) ("even where there is some error in state

post-conviction proceedings, a petitioner is not entitled to federal habeas relief because the

assignment of error relating to those post-conviction proceedings represents an attack on a

proceeding collateral to detention and not to the detention itself.").

Lastly, no miscarriage of justice has occurred in this case. Although he suffers from

mental illness, the record supports the finding that Webb was competent to stand trial, not

intellectually deficient, and knowingly and voluntarily exercised his right to represent himself.

---

[16] Two of the motions for summary judgment appear to be identical. The third, [Dkt. No. 23],
presents no intelligible argument and complains about Webb's medical issues, principally his
need for surgery to repair a hernia.

For example, Webb correctly identified the key issue in his case, the warrantless entry into the townhouse, even though the evidence showed the officers' warrantless entry was fully justified under the emergency exception to the warrant requirement. See Kentucky v. King, 563 U.S. 452, 460 (2011) (internal quotation marks omitted) (the emergency aid exception allows police officers "to enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). The officers did "not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." Michigan v. Fisher, 558 U.S. 45, 49 (2009). And the sweep of the house to make sure no one else was there after officers found Edna's body was reasonable. United States v. Hill, 649 F.3d 258, 265 (4th Cir. 2011) (exigent circumstances justify a warrantless search and do not violate the Fourth Amendment if "the circumstances would cause an officer to have an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'" (citation omitted)).

The undisputed facts in the state court proceedings established that there was a window of about twenty or so minutes from the end of Nanette Britt's telephone conversation with Webb until Officer Frantz arrived at Edna's townhouse. Within 30 minutes, Frantz and Slodysko had found Edna's body in the kitchen. Edna had been dead for 12 hours, there was evidence that someone had attempted to clean up the crime scene, and there was no evidence that anyone other than Webb had been in the house during the twelve hours. Although Frantz thought he had heard someone in the house, he and Slodysko secured the house until other officers arrived and a thorough search was conducted, which determined there was no one else in the house. In addition, the officers knew that Edna had been in the process of having Webb evicted, Webb and Edna had recently had an argument, Webb told people Edna had "provoked" him, and he had

27

threatened to kill Edna and "bury her body." There was, on this record, sufficient circumstantial

evidence to convict Webb of Edna's murder and it is clear that no miscarriage of justice

occurred.

## VI. Conclusion

For the reasons discussed above, respondent's Motion to Dismiss [Dkt. No. 16] will be

granted, Webb's three motions for summary judgment [Dkt. Nos. 23, 24, 25] will be denied, and

this petition will be dismissed with prejudice by an order to be issued with this Memorandum

Opinion.

Entered this _14th_ day of September 2022.

Alexandria, Virginia

_/s/_ _____

Leonie M. Brinkema
United States District Judge